" * * * The defense of failure of consideration can be made where the maker of the note is promised something in the future by the payee that he has failed to do."

That is exactly the situation here. The payee of the note agreed that the same should be paid out of the business of the insurance agency taken over by the plaintiff, and that agreement was violated by the plaintiff in putting it out of the power of the defendant to pay the note in the manner indicated by destroying that business.

[5] In view of these alleged facts which were not stricken from the answer (those facts pertaining to the reconventional demand only being dismissed), we are unable to see how plaintiff could have been given judgment on the face of the papers.

In Act 157 of 1912 as amended by Act 300 of 1914, it is declared:

"For the purpose of the trial of such rule [to take judgment on the face of petition and answer] all material allegations of fact contained in the petition and not denied in the answer, and all allegations of fact contained in the answer, shall be deemed and taken as true."

The facts alleged in the answer were a denial of any liability on the note for the reason that there had been a failure of consideration, and the facts which would establish this failure of consideration were set out in detail. Under the plain language of the statute these facts were to be deemed true on the trial of the rule. The rule should have been denied.

For the reasons assigned it is adjudged and decreed that the judgment appealed from be annulled and set aside, and it is now ordered that the exception and motion to strike out from the answer the reconventional demand be overruled, and that the case be remanded to the civil district, parish of Orleans, division G, to be tried according to law and the views herein expressed. The costs of this appeal to be paid by the plaintiff, and all other costs subject to the final disposition of the case.

Rehearing refused by Division A, composed of O'NIELL, C. J., and ROGERS and BRUNOT, JJ.

━━━━━━

(99 South. 446)

No. 24090.

## NEW ORLEANS COAL CO. v. BLUEFIELDS FRUIT & S. S. CO.

(Dec. 10, 1923. Rehearing Denied by Whole Court March 3, 1924.)

*(Syllabus by Editorial Staff.)*

Corporations ⬡⟝426(2)—Coal company held not authorized to repudiate contract of sale which its agent wrongfully permitted buyer to believe was signed.

Where a coal company delivered coal to a steamship company under a contract for a fixed price per ton, which the steamship company believed had been signed by the coal company, and it appeared that the fact that such contract had not been signed was concealed from the steamship company through the wrong of the agents of the coal company, *held*, in an action by the coal company for the purchase price of coal, computed at a rate in excess of that fixed by the contract, that the coal company would not be permitted to take advantage of its own wrong, and that recovery under the contract rate only could be allowed.

Appeal from Civil District Court, Parish of Orleans; Fred D. King, Judge.

Action by the New Orleans Coal Company against the Bluefields Fruit & Steamship Company. Judgment for defendant, and plaintiff appeals. Affirmed.

E. M. Stafford and H. W. Robinson, both of New Orleans, for appellant.

Dufour & St. Paul and McCaleb & McCaleb, all of New Orleans, for appellee.

By Division B, composed of DAWKINS, LAND, and LECHE, JJ.

LECHE, J. Defendant was engaged in the transportation of fruit from Central America to New Orleans, and for the conduct of its

business controlled and maintained a line of steamships plying between New Orleans and Central American ports. It fueled its ships in New Orleans, and for that purpose it necessarily had to purchase large quantities of coal in the port of New Orleans. Prior to the month of September, 1916, it had been buying coal at $3.25 per ton, delivered, under a contract which was to expire on August 31, 1916. During the month of August, 1916, plaintiff, then engaged in the coal business in the city of New Orleans, proposed through its local manager to furnish defendant at the same price, i. e. $3.25 per ton, and under the same terms and conditions, with Warrior Black Creek Coal, which it agreed to guarantee. would, by its superior heat-producing qualities, effect a saving to defendant of 10 per cent. on the amount of coal which was then being consumed as fuel on its ships.

Plaintiff's proposal is contained in the following letter:

"New Orleans Coal Company.

"High Grade Steamship Coal.

"New Orleans, August 29, 1916.

"Bluefields Fruit & S. S. Company, Whitney Bank Building, City—Gentlemen: As per my conversation with your Mr. De Lerno, we will agree to make contract for bunkering your ships, under the same terms and conditions as our agreement with the American Fruit & S. S. Co., who was controlled by your company, and will further agree to insert a clause guaranteeing that Warrior Black Creek washed coal will give better results than the present coal you are using, to the extent of 10 per cent. in consumption.

"I understand you own the S. S. Nicaraguan, and would be satisfied that the reports from the engineer's log of this ship would govern, or other ships that you may designate. Other words, we guarantee that you will burn 10 per cent. less Warrier Black Creek coal on your ships than the present coal you are using.

"Hoping to be favored with your business,

"Respectfully yours,

"New Orleans Coal Company,

"[Signed] W. A. Bisso, President."

Upon receipt of this letter defendant had its attorneys draw up a written contract embodying the conditions of the foregoing proposal, with usual stipulations, and containing a special guaranty on the part of the Warrior Black Creek Coal Company that defendant would effect a saving of 10 per cent. in accordance with plaintiff's written proposal. A duplicate of the contract was forwarded to the president of plaintiff company, who received it, and who says that he sent it for approval and signature to the Warrior Creek Coal Company, in Birmingham, Ala.

Deliveries of coal were commenced at once under what defendant considered a closed contract, but under what plaintiff now claims was a temporary arrangement between itself and De Lerno, a representative of the defendant company. It is remarkable that every important step in the creation of the contract upon which defendant relies, and the admitted repudiation of the contract on the part of the plaintiff, on May 3, 1917, are evidenced in writing, and that plaintiff should now rely upon a verbal contract claimed to have been entered into by it with De Lerno, manager of defendant company. De Lerno, subsequent to these business negotiations, unfortunately departed this life, and the court is consequently deprived of the benefit of his testimony in its investigation of the facts which are in contestation in this suit.

On March 31, 1917, there was held a meeting of the executive committee of the board of directors of defendant company, at which W. A. Bisso, president of the plaintiff company, was present. The purpose of that meeting was to try and adjust differences that had arisen between plaintiff and defendant as to the price at which the coal should be charged to defendant. It seems that some time after the 1st of November, 1916, plaintiff began to bill its deliveries to defendant at prices in excess of $3.25 per ton. Defendant, however, relying upon what it considered a closed contract, and having absolute and immediate need of the coal, continued to

accept deliveries, but made no payment based upon the increased or additional price per ton. On the contrary, in its remittances to plaintiff it protested against what it considered an unjustifiable overcharge, and limited the amount of its payments upon a basis of $3.25 per ton. Defendant's conduct in its dealings with plaintiff appears to have been frank and open, free from any concealment by which plaintiff could be misled or induced into error. The fact that President Bisso attended that meeting and acknowledged that he knew its purpose is an admission on his part that he did not consider that defendant had by its conduct or actions agreed to pay the increased prices which he had been charging for the deliveries made subsequent to the first of November, 1916.

The parties are far apart as to what took place at the meeting on March 31, 1917. Bisso claims that he had informed De Lerno that the mine owners in Birmingham had refused to sign the contract which defendant had drawn up in writing, that he communicated that refusal at once to De Lerno, and that by verbal agreement with De Lerno he would continue to deliver coal to defendant on a basis of the prices prevailing in the open market. He denied, when questioned as to what had become of the document evidencing the written contract, that he had informed defendant's directors that it had been signed by the mining company. On the other hand, the directors of the defendant company who were present at the meeting all testify that Bisso never claimed to have been delivering coal under a verbal temporary agreement with De Lerno, but, on the contrary, told them that the contract had been signed by the president of the mining company, that he held it in his possession, and that he had failed to deliver it to defendant upon telegraph or telephone instructions from the mining company. The purpose of the meeting to adjust differences was thus left unaccomplished, and it was only one month later,

on May 3, 1917, that Bisso wrote defendant the following letter:

"New Orleans Coal Company.
"New Orleans, La., U. S. A.,
"May 3, 1917.
"Mr. Chas. De Lerno, Manager, Bluefields Fruit S. S. Co.—Dear Sir: Your letter of May 1st received, together with your voucher for $1,530.00, for coal delivered S. S. Lisboa, April, 20, 1917.
"We also beg to advise that we know nothing of a contract between the new Orleans Coal Company and the Bluefields Fruit & S. S. Company.
"Respectfully,
"New Orleans Coal Company,
"[Signed]            W. A. Bisso, President."

Thereafter deliveries of coal by plaintiff to defendant ceased, and plaintiff then sued to recover a balance claimed to be due by defendant, according to an account wherein defendant is charged the prices prevailing on the New Orleans coal market.

The district court rendered judgment in favor of plaintiff for a balance due, based upon the prices fixed in plaintiff's letter of August 29, 1916, that is, $3.25 per ton, and from that judgment plaintiff has appealed.

It thus appears that the sole issue in the case is whether plaintiff is bound by its offer of August 29, 1916, and by the additional stipulations contained in the written contract drawn up by defendant, and immediately thereafter forwarded to and received by plaintiff.

Our ultimate conclusions are that deliveries of coal by plaintiff and the acceptance of such deliveries by defendant were made with a view of performing the contract, and in execution of the same; that defendant was left under the impression that the contract had been closed; that Bisso, president and manager of plaintiff company, whether designedly or negligently, it matters not, kept the fact that the mining company had failed to approve and sign the contract concealed from the defendant; and that it would be

·inconscionable to permit plaintiff company to take advantage of its own wrong doing and thus evade its responsibilities under that contract.

Similar conclusions were reached by the district court, and for these reasons,

The judgment appealed from is affirmed.

Rehearing denied by the WHOLE COURT.